UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMMODITY FUTURES TRADING
COMMISSION,

                              Plaintiff,

v.

JASON AMADA and AMADA CAPITAL
MANAGEMENT LLC,

                              Defendants.

Case No.:  1:18-CV-7895

**COMPLAINT FOR INJUNCTIVE RELIEF,
CIVIL MONETARY PENALTIES, AND OTHER RELIEF**

Plaintiff, Commodity Futures Trading Commission ("Commission") alleges as follows:

## I.    SUMMARY

1.      In February 2014, the Commission's Division of Enforcement sent Defendant

Jason Amada ("Amada") a letter notifying him that he was required to be registered with the

Commission as a commodity trading advisor ("CTA") because he was soliciting clients for

individually managed forex accounts through a website.  Rather than register as required by the

Commodity Exchange Act ("Act") and Commission Regulations ("Regulations"), Amada shut

down his website.  The cessation of his illegal solicitation of clients, however, was short-lived.

Amada never intended to cease his conduct that the Commission informed him would require

registration.

2.      From at least February 2014 through at least November 2015 (the "Relevant

Period"), Defendants Amada Capital Management ("ACM"), an unregistered CTA, and Amada,

an unregistered associated person ("AP") of ACM, (collectively, "Defendants"), fraudulently

solicited at least one client to open an individually managed trading account for off-exchange foreign currency contracts ("forex") and caused approximately $280,000 in losses in less than two months of trading.

3.      On or before June 22, 2015, Defendants established a new website, www.amadacapitalfx.com ("Website").   The Website was nearly identical in content to the website Amada operated prior to receiving notice in February 2014 of the registration requirements associated with soliciting clients for individually managed forex accounts through a website.

4.      Through the Website, ACM held itself out generally to the public as a CTA and solicited potential clients to open individually managed forex trading accounts.   The Website claimed that ACM "only accept[s] Non-US clients"; however, this was false.   Defendants solicited at least one client in the United States ("Client A") and directed Client A to visit the Website for information about ACM's managed account services.

5.      Defendants persuaded Client A to open a forex account and also obtained written authorization to manage Client A's forex account.

6.      Defendants made fraudulent misrepresentations to Client A about how Defendants would manage Client A's account.   Client A deposited approximately $280,000 to a forex account for Defendants to manage.   Defendants misrepresented that they would limit Client A's losses to 1% of the account value through the implementation of a hedging strategy.   Rather than implement a hedging strategy, Defendants traded speculatively and aggressively—losing approximately 92% of Client A's account value in the first nine days of trading.   During Defendants' mismanagement of Client A's account, Defendants attempted to mask the losses through additional misrepresentations and omissions to Client A.

7.      In less than two months of managing the forex trading for Client A, Defendants caused approximately $280,000 in trading losses—with Client A withdrawing the remaining approximately $1,000 balance and closing the account.

8.      Client A was neither an eligible contract participant ("ECP"), nor an eligible commercial entity ("ECE").

9.      During the Relevant Period, ACM failed to register as a CTA and Amada failed to register as an AP of a CTA.

10.     By virtue of this conduct and the conduct further described herein, Defendants, either directly or as controlling persons, have engaged, are engaging, or are about to engage in acts and practices in violation of Sections 2(c)(2)(C)(iii)(I)(bb), 4b(a)(2), 4k(3), 4m(1), and 4*o*(1) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(bb), 6b(a)(2), 6k(3), 6m(1), 6*o*(1) (2012), and Regulations 5.2(b)(1) and (3), and 5.3(a)(3), 17 C.F.R. §§ 5.2(b)(1), (3), 5.3(a)(3) (2018).

11.     During the Relevant Period, Defendant Amada was an officer, employee, or agent of ACM.  Therefore, ACM is liable for the acts and omissions of Amada done in the scope of his employment or office, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2018).

12.     Defendant Amada was a controlling person of ACM throughout the Relevant Period and did not act in good faith or knowingly induced ACM's violations of the Act and Regulations described herein.  Therefore, Amada is liable for ACM's violations of the Act and Regulations, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

13.     Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), the Commission brings this action to enjoin Defendants' unlawful acts and practices, to compel their compliance with the Act and the Regulations promulgated thereunder, and to enjoin them from

engaging in any commodity related activity.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other and further relief as the Court may deem necessary and appropriate.

## II.   JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2012) (federal question jurisdiction) and 28 U.S.C. § 1345 (2012), which provides that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress.  Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), authorizes the Commission to seek injunctive relief in any proper district court of the United States against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

15.    Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e), because the acts and practices in violation of the Act and Regulations have occurred within this District.

## III.   THE PARTIES

16.    Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and the Regulations.  The Commission is headquartered at 1155 21st Street, NW, Washington, DC 20581.

17.    Defendant **Amada Capital Management LLC**, which also did business as Amada Capital Markets and ACM Capital Markets, is a New York entity with its last known

4

place of business at 110-33 72nd Avenue Suite 1A, New York, New York, 11375.  ACM has never been registered with the Commission in any capacity.

18.     Defendant **Jason Amada** is a resident of New York City and is the sole owner and sole managing member of ACM and operated its Website.  Amada has never been registered with the Commission in any capacity.

## IV.     STATUTORY AND REGULATORY BACKGROUND

19.     Section 1a(18)(A)(xi) of the Act, 7 U.S.C. § 1a(18)(A)(xi) (2012), defines an ECP, in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the transaction to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.

20.     Regulation 5.1(i), 17 C.F.R. § 5.1(i) (2018), defines a retail forex account as the account of a person who is not an ECP, established with a retail foreign exchange dealer or a futures commission merchant, in which account retail forex transactions (including options on contracts for the purchase or sale of foreign currency) with such retail foreign exchange dealer or futures commission merchant as counterparty are undertaken, or which account is established in order to enter into such transactions.

21.     17 C.F.R. § 5.1(m) defines a retail forex transaction as any account, agreement, contract or transaction described in Section 2(c)(2)(B) or 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(B) or 2(c)(2)(C) (2012).  A retail forex transaction does not include an account, agreement, contract, or transaction in foreign currency that is a contract of sale of a commodity for future delivery (or an option thereon) that is executed, traded on or otherwise subject to the rules of a contract market designated pursuant to Section 5(a) of the Act, 7 U.S.C. § 7(a) (2012).

22.     Pursuant to 7 U.S.C. § 2(c)(2)(C)(ii)(I), "[a]greements, contracts, or transactions" in retail forex accounts are subject to Sections 4b and 4*o* of the Act, 7 U.S.C. §§ 6b, 6*o* (2012), except in circumstances not relevant here.

23.     Regulation 5.2(b)(1) and (3), 17 C.F.R. § 5.2(b)(1), (3) (2018), provides, in relevant part, that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction: (1) [t]o cheat or defraud or attempt to cheat or defraud any person; . . . or (3) [w]illfully to deceive or attempt to deceive any person by any means whatsoever."

24.     7 U.S.C. § 1a(12)(A)(i)(II) defines a CTA, in pertinent part, as any person who "for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in— (II) any agreement, contract, or transaction described in [S]ection 2(c)(2)(C)(i) or 2(c)(2)(D)(i)[of the Act]."

25.     17 C.F.R. § 5.1(e)(1) defines a retail forex CTA as any person who exercises discretionary trading authority or obtains written authorization to exercise discretionary trading authority over any account for or on behalf of any person that is not an ECP, in connection with retail forex transactions.

26.     7 U.S.C. § 6*o*(1) prohibits CTAs and APs of CTA, among others, whether registered with the Commission or not, from using the mails or any means or instrumentality of interstate commerce, directly or indirectly, from (A) employing devices, schemes, or artifices to defraud any client, participant, or prospective client or participant, or (B) engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon any client or participant or prospective client or participant.

27.     Subject to certain exceptions not relevant here, Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2012), states that it shall be "unlawful for any commodity trading advisor . . . unless registered under this Act, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such commodity trading advisor."

28.     Subject to certain exceptions not relevant here, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(bb) states that a

> "person, unless registered in such capacity as the Commission by rule, regulation, or order shall determine and a member of a futures association registered under section 17, shall not—
> . . .
>
> (bb)   exercise discretionary trading authority or obtain written authorization to exercise written trading authority over any account for or on behalf of any person that is not an eligible contract participant in connection with [retail forex transactions] …"

29.     For purposes of retail forex transactions, 17 C.F.R. § 5.1(e)(1) defines a forex CTA as any person who exercises discretionary trading authority or obtains written authorization to exercise discretionary trading authority over any account for or on behalf of any person that is not an ECP.

30.     Except in circumstances not relevant here, Regulation 5.3(a)(3)(i), 17 C.F.R. § 5.3(a)(3)(i) (2018), requires those that meet the definition of forex CTA to register as a CTA with the Commission.

31.     Section 4k(3) of the Act, 7 U.S.C. § 6k(3) (2012), states that "[i]t shall be unlawful for any person to be associated with a commodity trading advisor as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of a client's or prospective client's discretionary account or (ii) the supervision of any person or persons so engaged . . ." unless registered.

32.     An AP of a CTA is defined by Regulation 1.3, 17 C.F.R. § 1.3 (2018), as any natural person who is a "partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves: (i) the solicitation of a client's or prospective client's discretionary account, or (ii) the supervision of any person or persons so engaged."

33.     For purposes of retail forex transactions, 17 C.F.R. § 5.1(e)(2) defines an AP of a CTA as any natural person associated with a CTA as a partner, officer, employee, consultant or agent, in any capacity, which involves either: (1) the solicitation of a client's or prospective client's discretionary account; or (2) the supervision of any person or persons so engaged. Except in circumstances not relevant here, 17 C.F.R. § 5.3(a)(3)(ii) requires those that meet the definition of a forex AP of a CTA to register with the Commission.

## V.     FACTS

### A.     Defendants Fraudulently Solicited a Client for a Managed Forex Account.

34.     Defendants fraudulently solicited at least one client to open a managed forex account by misrepresenting Client A's risk of loss associated with forex trading.  Specifically, Defendants made false statements to Client A that they would implement a hedging strategy to protect Client A's funds from loss, that Defendants had significant and profitable experience trading forex for clients, and that Client A's account would be opened through a registered retail foreign exchange dealer ("RFED").  A registered RFED could legally enter into retail forex transactions with U.S. customers under the Act and Regulations.

35.     Defendants did not disclose to Client A that Defendants would ultimately receive commissions for trades placed in Client A's account, whether or not the trades were profitable. Defendants then used some of the commissions generated through trading Client A's account to

reimburse Client A's account in an attempt to cover up the mounting losses—all without informing Client A of the losses or reimbursements.

1. **Defendants Made Misrepresentations Concerning the Risk of Loss Associated with Forex Trading and Defendants' Profitable Trading History and Qualifications.**

36.     In May 2015, Amada met Client A through a social networking website.  During their initial interactions, Amada stated that he was a licensed, professional currency trader. Client A was physically present in New York City.  Amada and Client A met in person on at least one occasion and also communicated via email, text, and telephone on other occasions.

37.     On or around July 30, 2015, because of Amada's representations that he was a professional currency trader, Client A sought advice from Amada concerning money she needed to convert from Euros to U.S. Dollars for the purchase of real estate in New York City.

38.     Client A told Amada that she had a low risk tolerance for the conversion of the funds because the money would be needed to pay for a property Client A was under contract to purchase—with a closing date in or around January 2016.  Client A informed Amada that losing more than 1% of the money would jeopardize the property transaction and potentially result in the loss of the down payment.

39.     Amada stated that he had another client "in a similar situation" and suggested that Client A open an account with a RFED to implement a hedging strategy and avoid "transfer fees" that would otherwise be charged by a bank to convert the money from Euros to U.S. Dollars.  Amada also sent a link directing Client A to ACM's Website, which provided additional information concerning ACM's offering of managed forex accounts for clients, including claims that ACM had achieved year-to-date client profits of 99%.  Through these initial discussions, and later communications, Amada solicited Client A to open a retail forex account in which Defendants would exercise discretionary trading authority.

40.     Amada's representations were false.

41.     First, Amada was not "licensed."  He has never been registered with the Commission even though Amada knew that the broad solicitation of the public, through the Website, for managed forex accounts, required registration.  Second, Amada did not manage any accounts—whether owned by him or by ACM clients—that experienced profitable trading results, let alone anywhere near the 99% claimed on the Website.  Third, Amada never intended to execute a hedging strategy on behalf of Client A.  The trading he executed in Client A's account was inconsistent with any purported hedging strategy; in fact, the trading was so speculative in nature that Defendants' trading lost approximately 92% of Client A's funds after only nine days of trading.

42.     Also, despite knowing that Client A was a U.S. citizen, he directed Client A to use her foreign-issued passport to open a managed forex account at a foreign, unregistered RFED—falsely representing that it was merely a division of a U.S. entity that was for clients "that have Euro based funds."  He also told Client A that the foreign RFED had "tighter spreads" for the traders that would allow him to better implement his "hedging" strategy.

43.     Amada directed Client A to open her account with the foreign RFED because its registered, U.S.-based affiliate would not permit Amada to generate and receive commissions as an introducing broker without being registered with the Commission.  Also, the foreign RFED permitted greater leverage for trading than the registered U.S.-based affiliate, which consequently permitted riskier trading to occur in that account.

44.     Amada also failed to disclose that the foreign RFED at which Client A opened her account was not registered with the Commission, and was therefore not permitted to serve as the counterparty for retail forex transactions with U.S. customers.

45.     On September 6, 2015, relying on Amada's misrepresentations, Client A entered into a Money Management Agreement ("MMA") with Defendants.   Among other things, the MMA stated that Amada would have discretionary authority to execute forex transactions on Client A's behalf.   The agreement also recited Client A's maximum loss target of 1% and that Amada "will adjust the position size and risk management accordingly to stay within these guidelines."   The MMA, however, was never provided to the foreign RFED.

46.     On September 6, 2015, Client A also signed a Managed Account Authorization, Limited Power of Attorney ("POA") with the foreign RFED.   By its terms, the POA authorized a money manager, namely, Amada's father, to place trades in Client A's account.   Even though the POA nominally authorized Amada's father to trade Client A's account, Amada actually directed the trading.   The POA also indicated that the money manager would receive, as compensation, 20% of profits from the managed account.

47.     Amada was not identified on the POA filed with the RFED.   When Client A questioned Amada about his father being listed on the POA, Amada told her that it was a family business, that it was just a formality, and that Amada would be the one conducting all the trading in the account.   Client A did not have any interaction with Amada's father until after she closed the trading account in November 2015.

48.     Amada's name, however, did not appear on official documents filed with the foreign RFED because Amada was taking steps to hide, on paper, his involvement in Client A's account because the RFED had rejected Amada's previous applications to become a money manager.

49.     Nonetheless, Amada directed all account activity through communications with at least one of the RFED's employees.

**2. Defendants Did Not Disclose That They Would Receive Commissions from the Trading in Client A's Account, Regardless of Profitability.**

50.     On August 19, 2015, Amada's mother entered into an Introducing Broker Agreement with the same foreign RFED.  By the terms of this agreement, the foreign RFED established a control account ("Control Account") in the name of Amada's mother for the purpose of earning commissions based on the trading activity of customers she introduced to the foreign RFED.

51.     The foreign RFED treated Client A's account as an account introduced by Amada's mother.  The foreign RFED paid commissions to the Control Account based on forex trading in Client A's account that was executed by Amada using his father's Money Manager Account.  Client A's account was the only account associated with the Control Account.

52.     Amada directed and performed all actions related to the formation of the Control Account and its transfer of funds through communications with at least one of the RFED's employees.

53.     Amada did not disclose to Client A the existence of the Control Account or that the Control Account would receive commissions for trades placed in Client A's account, whether or not the trading was profitable.

**3. Defendants Engaged in Speculative Trading and Covered Up the Losses by Hiding Reimbursements Sent from the Control Account.**

54.     On September 15, 2015, Client A funded the account with a deposit of €249,121.99 ($280,000).[1]  Amada began trading forex in Client A's account the same day. Rather than execute a hedging strategy for Client A's Euro-based funds, as Amada claimed he would, he began speculating on the movement of forex currencies by trading both the U.S.

---

[1] All U.S. Dollar values are approximated based on exchange rates in place at the time of the conduct.

Dollar and the Euro currencies against multiple foreign currencies, including the Japanese Yen, New Zealand Dollar, Canadian Dollar, Australian Dollar, and Swiss Franc.

55.     Between September 15, 2015 and September 23, 2015, Client A's account suffered approximately €230,000 ($258,000) in losses—approximately 92% of the account's value.  Over this same period, the Control Account received approximately €95,000 ($106,000) in fees from trading Client A's account.

56.     To cover up his enormous trading losses, on September 21, 2015, Amada requested that the RFED return €50,000 ($56,000) to Client A from the Control Account.  On September 23, 2015, the RFED completed the transfer from the Control Account to Client A. Between, September 23, 2015 and September 30, 2015, Amada lost an additional €62,889 ($70,000)—the remaining funds from Client A's initial deposit, plus most of the €50,000 ($56,000) transferred from the Control Account.  In just the first two weeks of trading—between September 15, 2015, and September 30, 2015—the Control Account received €136,158.89 ($153,000) in commissions from Amada's trading of Client A's account—based on an initial deposit of about €250,000 ($280,000).

57.     Over the remaining time the account stayed open, Amada made an additional five requests for the RFED to refund fees from the Control Account to Client A to hide the significant losses in the account.  Amada directed the RFED to make the following transfers from the Control Account to Client A:

     i.     October 1, 2015 – €30,000 ($34,000);

     ii.     October 6, 2015 – €25,000 ($28,000);

     iii.     October 9, 2015 – €15,000 ($17,000);

     iv.     October 19, 2015 – €6,500 ($7,300); and

v.      October 27, 2015 – €3,000 ($3,300).

58.     Amada did not inform Client A that money was being transferred to Client A's account to cover losses sustained through trading.  Further, Amada sought confirmation from the RFED that Client A would not receive notification of the transfers, other than the deposit appearing as an entry on Client A's monthly statement.

59.     On October 5, 2015, Amada transferred €30,000 ($34,000) from the Control Account to his mother's bank account.  Most of the funds ultimately made their way to Amada's personal bank account.

60.     On November 4, 2015, after discovering Amada's conduct, Client A withdrew the remaining balance of €899.79 ($1,000) and closed the trading account.

61.     In total, Defendants generated and received approximately €162,000 ($180,000) in commissions through the Control Account, most of which was redeposited to Client A's trading account and lost in trading.

**B.      Defendants Failed To Register with the Commission**.

62.     Defendants operated the Website, which held ACM out generally to the public as a commodity trading advisor.  The Website solicited clients to open trading accounts that would be managed by Defendants.

63.     Amada provided Client A with the address for the Website via text message on August 3, 2015, as part of his solicitation of Client A to open an individually managed forex trading account.

64.     During the Relevant Period, Defendants ACM and Amada acted as a CTA, and its AP, respectively, by exercising discretionary trading authority or obtaining written authorization to exercise discretionary trading authority over an account in connection with retail forex transactions.  In addition, Defendants ACM and Amada acted as a CTA and its AP, respectively,

by providing retail forex trading advice for compensation or profit, and used emails, text messages, the Internet, or other means or instrumentality of interstate commerce to solicit clients for management of retail forex accounts.

65.    During the Relevant Period, Defendant ACM was not registered with the Commission as a CTA nor was it exempt or excluded from registration as a CTA.

66.    During the Relevant Period, Defendant Amada acted as an AP of ACM by soliciting clients' or prospective clients' discretionary trading accounts.

67.    During the Relevant Period, Amada was not registered with the Commission as an AP of a CTA nor was he exempt or excluded from registration.

## VI.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT I – Managed Account Fraud, Solicitation Fraud, and Unauthorized Trading in Forex

**Violations of Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A), (C) (2012) and Regulation 5.2(b)(1) and (3), 17 C.F.R. § 5.2(b)(1), (3) (2018)**

68.    Paragraphs 1 through 67 are realleged and incorporated herein by reference.

69.    By reason of the conduct described above, Defendants, in or in connection with any order to make any contract of sale of any commodity in interstate commerce or for future delivery on a designated contract market for any other person: 1) cheated or defrauded or attempted to cheat or defraud the other person; or 2) willfully deceived or attempted to deceive the other person by any means whatsoever in regard to any order, or in regard to any act of agency performed, with respect to any order or contract.

70.    By reason of the foregoing, Defendants violated 7 U.S.C. § 6b(a)(2)(A), (C) (2012), and 17 C.F.R. § 5.2(b)(1), (3) (2018).

71.     When Amada committed the acts, omissions, and failures in violation of 7 U.S.C. § 6b(a)(2)(A), (C) and 17  C.F.R. § 5.2(b)(1), (3), he was acting within the scope of his agency, employment, and office at ACM; therefore, such acts, practices, omissions, or failures are deemed to be those of ACM pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2018).

72.     At all times relevant to this Complaint, Amada controlled ACM, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, ACM's conduct alleged in this Count; therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Amada is liable for Defendant ACM's violations of 7 U.S.C. § 6b(a)(2)(A), (C) and 17 C.F.R. § 5.2(b)(1), (3).

73.     Each misrepresentation or omission of material fact, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6b(a)(2)(A), (C) and 17 C.F.R. § 5.2(b)(1), (3).

**COUNT II – Fraud by a Commodity Trading Advisor and Its Associated Person**

**Violations of Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1) (2012)**

74.     Paragraphs 1 through 67 are re-alleged and incorporated herein by reference.

75.     During the Relevant Period, ACM engaged in the business of advising others, for compensation or profit, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in forex contracts for compensation or profit; therefore, ACM acted as a CTA as defined by Section 1a(12) of the Act, 7 U.S.C. § 1a(12) (2012), and Regulation 5.1(e)(1), 17 C.F.R. § 5.1(e)(1) (2018).

76.     During the Relevant Period, Defendant Amada acted as an AP of ACM by soliciting a client's discretionary trading account.

77.     By reason of the conduct described above, Defendants, while acting as a CTA and an AP of CTA, through use of the mails or any means or instrumentality of interstate commerce: (A) employed devices, schemes, or artifices to defraud any client, participant, or prospective client or participant; or (B) engaged in transactions, practices, or courses of business which operate as a fraud or deceit upon any client or participant or prospective client or participant.

78.     By reason of the foregoing, Defendants violated 7 U.S.C. § 6o(1).

79.     When Amada committed the acts, omissions, and failures in violation of 7 U.S.C. § 6o(1), he was acting within the scope of his agency, employment, and office at ACM; therefore, such acts, practices, omissions, or failures are deemed to be those of ACM pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

80.     At all times relevant to this Complaint, Amada controlled ACM, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, ACM's conduct alleged in this Count; therefore, pursuant to 7 U.S.C. § 13c(b), Amada is liable for Defendant ACM's violations of 7 U.S.C. § 6o(1).

81.     Each act of misrepresentation or omission of material fact, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6o(1).

### COUNT III – Failure To Register as a Forex Commodity Trading Advisor and Failure To Register as an AP of a Forex Commodity Trading Advisor

**Violations of Sections 2(c)(2)(C)(iii)(I)(bb), 4k(3), and 4m(1) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(bb), 6k(3), 6m(1) (2012) and Regulation 5.3(a)(3), 17 C.F.R. § 5.3(a)(3) (2018)**

82.     Paragraphs 1 through 67 are re-alleged and incorporated herein by reference.

83. By reason of the conduct described above, ACM held itself out generally to the public as a commodity trading advisor and exercised discretionary trading authority over retail forex transactions in accounts for or on behalf of persons who were neither ECEs nor ECPs.

84. By reason of the conduct described above, ACM made use of the mails or other means of interstate commerce in connection with its CTA business and was not otherwise exempt or excluded from registration as a CTA.

85. ACM was not registered with the Commission as a CTA.

86. By reason of the foregoing, ACM violated 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(bb), 6m(1) and 17 C.F.R. § 5.3(a)(3)(i).

87. By reason of the conduct described above, Amada was a partner, officer, employee, consultant, or agent of ACM and he was involved in the solicitation of ACM's clients' or prospective clients' discretionary account or he supervised others who were so engaged.

88. Amada was not registered with the Commission as an AP.

89. By reason of the foregoing, Amada violated 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(bb), 6k(3), and 17 C.F.R. § 5.3(a)(3)(ii).

90. When Amada failed to register with the Commission as an AP, he was acting within the scope of his agency, employment, and office at ACM; therefore, such acts, practices, omissions, or failures are deemed to be those of ACM pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

91. At all times relevant to this Complaint, Amada controlled ACM, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, ACM's failure to register as a CTA alleged in this Count; therefore, pursuant to Section 13(b) of the Act, Amada is liable for

Defendant ACM's violations of 7 U.S.C. § 2(c)(2)(C)(iii)(I)(bb), 6k(3) and 6m(1) and 17 C.F.R. § 5.3(a)(3)(i), (ii).

## VII.   **RELIEF REQUESTED**

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers:

A.   Find that Defendants violated Sections 2(c)(2)(C)(iii)(I)(bb), 4b(a)(2)(A) and (C), 4k(3), 4m(1), and 4o(1) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(bb), 6b(a)(2)(A), (C), 6k(3), 6m(1), 6o(1) (2012), and Regulations 5.2(b)(1) and (3), and 5.3(a)(3), 17 C.F.R. §§ 5.2(b)(1), (3), 5.3(a)(3) (2018); and

B.   Enter an order of permanent injunction enjoining Defendants, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from violating 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(bb), 4b(a)(2)(A), (C), 6k(3), 6m(1), 6o(1) and 17 C.F.R. §§ 5.2(b)(1), (3), 5.3(a)(3);

C.   Enter an order of permanent injunction restraining and enjoining Defendants, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

1.   Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

2.   Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2018)), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

3.   Having any commodity interests traded on any Defendant's behalf;

4.  Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5.  Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6.  Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2018); and

7.  Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2018)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9).

D.  Enter an order directing Defendants, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act as described herein, including pre-judgment and post-judgment interest;

E.  An order requiring Defendants, jointly and severally, to make restitution to persons who have sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

F.     Enter an order directing Defendants and any of their successors, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the clients whose funds were received by them as a result of the acts and practices which constituted violations of the Act as described herein;

G.     Enter an order directing Defendants, jointly and severally, to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584 (2015), title VII, Section 701, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2018), for each violation of the Act, as described herein;

H.     Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2) (2012); and

I.     Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

August 29, 2018                         Respectfully submitted,

                                        PLAINTIFF COMMODITY FUTURES
                                        TRADING COMMISSION


                                        s/Peter L. Riggs
                                        Peter L. Riggs (MO Bar #57268)
                                        Nicholas S. Sloey (VA Bar #75438)
                                        Rachel A. Hayes (MO Bar #48713)
                                        Commodity Futures Trading Commission
                                        4900 Main Street, Ste. 500
                                        Kansas City, MO 64112
                                        Telephone:    816-960-7700
                                        Facsimile:    816-960-7751
                                        E-mail:       priggs@cftc.gov
                                                      nsloey@cftc.gov
                                                      rhayes@cftc.gov