USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  4/13/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

COMMODITY FUTURES TRADING
COMMISSION,

                              Plaintiff,

v.                                                          Case No.:  1:18-CV-7895

JASON AMADA and AMADA CAPITAL
MANAGEMENT LLC,

                              Defendants.

---

**CONSENT ORDER FOR PERMANENT INJUNCTION
AND OTHER EQUITABLE RELIEF AGAINST JASON AMADA
AND AMADA CAPITAL MANAGEMENT LLC**

## I.      INTRODUCTION

On March 14, 2019, Plaintiff Commodity Futures Trading Commission ("Commission")

filed a First Amended Complaint ("Complaint") (DE # 49) against Jason Amada ("Amada") and

Amada Capital Management LLC ("ACM") (together, "Defendants") seeking injunctive and

other equitable relief for violations of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-26

(2018), and the Commission's Regulations ("Regulations") promulgated thereunder, 17 C.F.R.

pts. 1-190 (2019).  On August 29, 2018, the New York State Office of the Attorney General

("NYAG") filed an Indictment against Defendant Amada, and later filed a Superior Court

Information.  *People v. Jason Amada*, Indictment No.: 3017-2018 and Superior Court

Information 3040-2019 (Supreme Court, New York County), (together, the "Criminal Action").[1]

---

[1] The Commission filed its original complaint against Defendants on August 29, 2018 ("Original Complaint").
(DE # 1).

## II.    CONSENTS AND AGREEMENTS

To effect settlement of all charges alleged in the Complaint against Defendants without a trial on the merits or any further judicial proceedings, the Defendants:

1.    Consent to the entry of this Consent Order for Permanent Injunction and Other Relief against Jason Amada and Amada Capital Management LLC ("Consent Order");

2.    Affirm that they have read and agree to this Consent Order voluntarily, and that no promise, other than as specifically contained herein, or threat, has been made by the Commission or any member, officer, agent, or representative thereof, or by any other person, to induce consent to this Consent Order;

3.    Acknowledge service of the summons and Complaint in this action;

4.    Admit the jurisdiction of this Court over them and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018);

5.    Admit the jurisdiction of the Commission over the conduct and transactions at issue in this action pursuant to the Act;

6.    Admit that venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e);

7.    Waive:

a.    Any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2018) and 28 U.S.C. § 2412 (2018), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. pt. 148 (2019), relating to, or arising from, this action;

b.    Any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, tit. II, §§ 201-253,

110 Stat. 847, 857-74 (codified as amended at 28 U.S.C. § 2412 and in scattered sections of 5 U.S.C. and 15 U.S.C.), relating to, or arising from, this action;

      c.     Any claim of Double Jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or any other relief, including this Consent Order; and

      d.     Any and all rights of appeal from this action.

8.     Consent to the continued jurisdiction of this Court over them for the purpose of implementing and enforcing the terms and conditions of this Consent Order and for any other purpose relevant to this action, even if they now or in the future reside outside the jurisdiction of this Court;

9.     Agree that they will not oppose enforcement of this Consent Order by alleging that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and waive any objection based thereon;

10.     Agree that neither they nor any of their agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or the Findings of Fact or Conclusions of Law in this Consent Order, or creating or tending to create the impression that the Complaint or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect their: (i) testimonial obligations; or (ii) right to take legal positions in other proceedings to which the Commission is not a party.  Defendants shall comply with this agreement, and shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement;

11.     Admit to all of the Findings of Fact in this Consent Order;

12.     In the Criminal Action, Defendant Amada pleaded guilty to one count of Grand

Larceny in the Second Degree in violation of New York Penal Law § 155.40(1) and one count of

Scheme to Defraud in the First Degree in violation of New York Penal Law § 190.65;

13.     Agree to provide immediate notice to this Court and the Commission by certified

mail, in the manner required by paragraph 95 of Part VI of this Consent Order, of any

bankruptcy proceeding filed by, on behalf of, or against either of the Defendants, whether inside

or outside the United States; and

14.     Agree that no provision of this Consent Order shall in any way limit or impair the

ability of any other person or entity to seek any legal or equitable remedy against Defendants in

any other proceeding.

### III.     FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, being fully advised in the premises, finds that there is good cause for the entry

of this Consent Order and that there is no just reason for delay.  The Court therefore directs the

entry of the following Findings of Fact, Conclusions of Law, permanent injunction and equitable

relief pursuant to Section 6c of the Act, 7 U.S.C. §13a-1 (2018), as set forth herein.

**THE PARTIES AGREE AND THE COURT HEREBY FINDS:**

A.     **Findings of Fact**

   1.     **The Parties to this Consent Order**

15.     Plaintiff **Commodity Futures Trading Commission** is an independent federal

regulatory agency charged by Congress with the administration and enforcement of the Act and

Regulations.  The Commission is headquartered at 1155 21st Street N.W., Washington, DC

20581.

16.     Defendant **Amada Capital Management LLC**, (a/k/a Amada Capital Markets, ACM Capital Markets, and Evolution FX Trading) is a New York entity with its last known place of business at 110-33 72nd Avenue, Suite 1A, Forest Hills, New York 11375.  ACM has never been registered with the Commission in any capacity.

17.     Defendant **Jason Amada** is a resident of New York, New York and is the sole owner and sole managing member of ACM and operated its websites.  Amada has never been registered with the Commission in any capacity.

**2.     ACM and Amada Fraudulently Solicited Client Funds for Managed Forex Accounts and Misappropriated Those Funds for Personal Use.**

18.     Between at least October 2013 and continuing to at least December 2018 (the "Relevant Period"), ACM, an unregistered commodity trading advisor, and Amada, an unregistered associated person of ACM, fraudulently solicited and accepted over $400,000 from at least seventeen clients for the purpose of trading off-exchange foreign currency contracts ("forex").

19.     In addition to accepting money from clients directly, Defendants fraudulently solicited at least one client ("Client A") to open an individually managed forex trading account through a Retail Foreign Exchange Dealer ("RFED") that ACM and Amada managed on behalf of the client.

20.     Defendants' clients were neither eligible commercial entities ("ECE"), nor eligible contract participants ("ECP"), as defined in Section 1a(17) and (18) of the Act, 7 U.S.C. § 1a(17), (18) (2018).

21.     Defendants represented to clients that they would use the funds to trade individually managed forex accounts opened in the clients' names.

22.     Defendants represented that they had years of profitable trading experience on behalf of clients.

23.     These representations were false as Defendants have no record of profitable forex trading.  Instead, ACM is nothing more than a sham company built to misappropriate client funds for personal use.

24.     Once ACM or Amada received funds from clients, they often withdrew the funds as cash.  Otherwise, Defendants primarily used clients' funds for personal expenses such as restaurant meals, rent, fantasy sports websites, and unrelated business expenses.  Defendants used only a small portion of client funds for forex trading and, despite claims to the contrary, Defendants never segregated the funds.  Defendants' limited forex trading was unprofitable overall.

25.     For example, on January 1, 2015, Amada had a beginning balance of $11.23 in his bank account at Urban Upbound Credit Union ("Urban Account").  On March 12, 2015, Amada received a wire for $5,000 from Client B for the purpose of Defendants managing a forex account on Client B's behalf.  The next day, Amada withdrew $2,000 in cash and issued a cashier's check to himself for $3,000.  During this time, Amada had no other transactions in his Urban Account.

26.     Defendants regularly provided clients with false account statements showing profitable trading on the clients' behalf.  There is no record of Amada or ACM ever engaging in profitable forex trading.  Defendants also used the false account statements to solicit additional funds from clients.

27.     For example, on March 27, 2018, Client C gave Amada a check for $10,000 to open an individually managed forex account.  Defendants then provided Client C with periodic,

false account statements showing consistent profits in Client C's trading account. Based on these statements showing profitable returns, Defendants solicited additional funds from Client C. Client C wrote ACM a check for $20,000 on July 14, 2018. On November 6, 2018—after Amada was released on bail in the Criminal Action—Amada solicited additional funds from Client C, again claiming that Defendants had placed profitable trades in Client C's forex account. Client C wrote Amada a check for $20,000 on November 6, 2018, for the purpose of providing additional capital to fund her individually managed trading account. Forex trading account statements that Client C received from Defendants reflected the additional deposits in her account. These account statements, however, falsely claimed that Defendants had profitably traded forex on Client C's behalf.

28.     Defendants also provided periodic payments to certain clients. In connection with these payments, Defendants claimed the payments represented profits from the trading on the client's behalf. In reality, the payments were Ponzi payments, derived from funds provided by other clients.

29.     In total, between October 2013 and March 14, 2019, Defendants obtained over $400,000 from clients and returned only a portion of the funds in the form of Ponzi payments. Through a combination of misappropriation and trading losses, Defendants caused $317,202 in losses to clients that provided money directly to them.

### 3.     Defendants Fraudulently Solicited a Client for a Managed Forex Account with a Foreign RFED.

30.     Defendants fraudulently solicited at least one client to open a managed forex account with a foreign Registered RFED by misrepresenting, among other things, Client A's risk of loss associated with forex trading. Specifically, Defendants made false statements to Client A that they would implement a hedging strategy to protect Client A's funds from loss, that

Defendants had significant and profitable experience trading forex for clients, and that Client A's account would be opened through a registered RFED, which could legally enter into retail forex transactions with U.S. customers under the Act and Regulations.

31.     Defendants did not disclose to Client A that Defendants would ultimately receive commissions for trades placed in Client A's account, whether or not the trades were profitable. Defendants then used some of the commissions generated through trading Client A's account to reimburse Client A's account in an attempt to cover up the mounting losses—all without informing Client A of the losses or reimbursements.

32.     Despite their promises to trade conservatively and guarantees against loss, Defendants engaged in excessive, speculative, and unauthorized trading, which caused Client A to lose $279,498.20 in less than two months of trading.

> **a.     Defendants Made Misrepresentations Concerning the Risk of Loss Associated with Forex Trading and Defendants' Profitable Trading History Qualifications.**

33.     In May 2015, Amada met Client A through a social networking website.  During their initial interactions, Amada stated that he was a licensed, professional currency trader. Client A was physically present in New York City.  Amada and Client A met in person on at least one occasion and also communicated via email, text, and telephone on other occasions.

34.     On or around July 30, 2015, because of Amada's representations that he was a professional currency trader, Client A sought advice from Amada concerning money she needed to convert from Euros to U.S. Dollars for the purchase of real estate in New York City.

35.     Client A told Amada that she had a low risk tolerance for the conversion of funds because the money would be needed to pay for property Client A was under contract to purchase—with a closing date in or around January 2016.  Client A informed Amada that losing

more than 1% of the money would jeopardize the property transaction and potentially result in the loss of the down payment.

36.     Amada stated that he had another client "in a similar situation" and suggested that Client A open an account with an RFED to implement a hedging strategy and avoid "transfer fees" that would otherwise be charged by a bank to convert the money from Euros to U.S. Dollars.  Amada also sent a link directing Client A to ACM's website, which provided additional information concerning ACM's offering of managed forex accounts for clients, including claims that ACM had achieved year-to-date client profits of 99%.  Through these initial discussions, and later communications, Amada solicited Client A to open a retail forex account in which Defendants would exercise discretionary authority.

37.     Amada's representations were false.

38.     First, Amada was not "licensed."  Amada has never been registered with the Commission even though he knew that the broad solicitation of the public, through ACM's website, for managed forex accounts, required registration.  In February 2014, the Commission's Division of Enforcement sent a letter to Amada notifying him that he was required to be registered with the Commission as a commodity trading advisor ("CTA") because he was soliciting clients for individually managed forex accounts through his website.  Rather than register as required by the Act and Regulations, Amada shut down his website.

39.     Second, Amada did not manage any accounts—whether owned by him or by ACM clients—that experienced profitable trading results, let alone anywhere near the 99% claimed on ACM's website.

40.     Third, Amada never intended to execute a hedging strategy on behalf of Client A. The trading he executed in Client A's account was inconsistent with any purported hedging

strategy; in fact, the trading was so speculative in nature that Defendants' trading lost approximately 92% of Client A's funds after only nine days of trading.

41.     Also, despite knowing that Client A was a U.S. citizen, Amada directed Client A to use her foreign-issued passport to open a managed forex account at a foreign, unregistered RFED—falsely representing that it was merely a division of a U.S. entity that was for clients "that have Euro based funds." He also told Client A that the foreign RFED had "tighter spreads" for the traders that would allow him to better implement his "hedging" strategy.

42.     Amada directed Client A to open her account with the foreign RFED because its registered, U.S.-based affiliate would not permit Amada to generate and receive commissions as an introducing broker without being registered with the Commission. Also, the foreign RFED permitted greater leverage for trading than the registered U.S.-based affiliate, which consequently permitted riskier trading to occur in that account.

43.     Amada also failed to disclose that the foreign RFED at which Client A opened her account was not registered with the Commission, and was therefore not permitted to serve as the counterparty for retail forex transactions with U.S. customers.

44.     On September 6, 2015, relying on Amada's misrepresentations, Client A entered into a Money Management Agreement ("MMA") with Defendants. Among other things, the MMA stated that Amada would have discretionary authority to execute forex transactions on Client A's behalf. The agreement also recited Client A's maximum loss target of 1% and that Amada "will adjust the position size and risk management accordingly to stay within these guidelines." The MMA, however, was never provided to the foreign RFED.

45.     On September 6, 2015, Client A also signed a Managed Account Authorization, Limited Power of Attorney ("POA") with the foreign RFED. By its terms, the POA authorized a

money manager, namely, Amada's father, to place trades in Client A's account. Even though the POA nominally authorized Amada's father to trade Client A's account, Amada actually directed the trading. The POA also indicated that the money manager would receive, as compensation, 20% of the profits form the managed account.

46.    Amada was not identified in the POA filed with the RFED. When Client A questioned Amada about his father being listed on the POA, Amada told her that it was a family business, that is was just a formality, and that Amada would be the one conducting all the trading in the account. Client A did not have any interaction with Amada's father until after she closed the trading account in November 2015.

47.    Amada's name, however, did not appear on official documents filed with the foreign RFED because Amada was taking steps to hide, on paper, his involvement in Client A's account because the RFED had rejected Amada's previous applications to become a money manager.

48.    Nonetheless, Amada directed all account activity through communications with at least one of the RFED's employees.

       **b.    Defendants Did Not Disclose that They Would Receive Commissions from the Trading in Client A's Account, Regardless of Profitability.**

49.    On August 19, 2015, Amada's mother entered into an Introducing Broker Agreement with the same foreign RFED. By the terms of this agreement, the foreign RFED established a control account ("Control Account") in the name of Amada's mother for the purpose of earning commissions based on the trading activity of customers she introduced to the foreign RFED.

50.    The foreign RFED treated Client A's account as an account introduced by Amada's mother. The foreign RFED paid commissions to the Control Account based on trading

in Client A's account that was executed by Amada using his father's Money Manager Account. Client A's account was the only account associated with the Control Account.

51.     Amada directed and performed all actions related to the formation of the Control Account and its transfer of funds through communications with at least one of the RFED's employees.

52.     Amada did not disclose to Client A the existence of the Control Account or that the Control Account would receive commissions for trades placed in Client A's account, whether or not the trading was profitable.

        **c.**      **Defendants Engaged in Speculative Trading and Covered up the Losses by Hiding Reimbursements Sent from the Control Account.**

53.     On September 15, 2015, Client A funded the account with a deposit of €249,121.99 ($280,000).[2]  Amada began trading forex in Client A's account the same day. Rather than execute a hedging strategy for Client A's Euro-based funds, as Amada claimed he would, he began speculating on the movement of forex currencies by trading both the U.S. Dollar and the Euro currencies against multiple foreign currencies, including the Japanese Yen, New Zealand Dollar, Canadian Dollar, Australian Dollar, and Swiss Franc.

54.     Between September 15, 2015 and September 23, 2015, Client A's account suffered approximately €230,000 ($258,000) in losses—approximately 92% of the account's value.  Over this same period, the Control Account received approximately €95,000 ($106,000) in fees from trading Client A's account.

55.     To cover up his enormous trading losses, on September 21, 2015, Amada requested that the RFED return €50,000 ($56,000) to Client A from the Control Account.  On September 23, 2015, the RFED completed the transfer from the Control Account to Client A.

---

[2] All U.S. Dollar values are approximated based on exchange rates in place at the time of the conduct.

Between September 23, 2015 and September 30, 2015, Amada lost an additional €62,889 ($70,000)—the remaining funds from Client A's initial deposit, plus most of the €50,000 ($56,000) transferred from the Control Account.  In just the first two weeks of trading—between September 15, 2015 and September 30, 2015—the Control Account received €136,158.89 ($153,000) in commissions from Amada's trading of Client A's account—based on an initial deposit of about €250,000 ($280,000).

56.     Over the remaining time the account stayed open, Amada made an additional five requests for the RFED to refund fees from the Control Account to Client A to hide the significant losses in the account.  Amada directed the RFED to make the following transfers from the Control Account to Client A:

      i.      October 1, 2015—€30,000 ($34,000);

      ii.     October 6, 2015—€25,000 ($28,000);

     iii.    October 9, 2015—€15,000 ($17,000);

     iv.    October 19, 2015—€6,500 ($7,300); and

     v.     October 27,2015—€3,000 ($3,300).

57.     Amada did not inform Client A that money was being transferred to Client A's account to cover losses sustained through trading.  Further, Amada sought confirmation from the RFED that Client A would not receive notification of the transfers, other than the deposit appearing as an entry on Client A's monthly statement.

58.     On October 5, 2015, Amada transferred €30,000 ($34,000) from the Control Account to his mother's bank account.  Most of the funds ultimately made their way to Amada's personal bank account.

13

59.     On November 4, 2015, after discovering Amada's conduct, Client A withdrew the remaining balance of €899.79 ($1,000) and closed the trading account.

60.     In total, Defendants generated and received approximately €162,000 ($180,000) in commissions through the Control Account, most of which was redeposited to Client A's trading account and lost in trading.

**4.     Defendants Failed to Register with the Commission.**

61.     Defendants operated at least three websites, which held ACM out generally to the public as a commodity trading advisor.  The websites solicited clients to open trading accounts that would be managed by Defendants.

62.     Amada provided Client A with the address for a website via text message on August 3, 2015, as part of his solicitation of Client A to open an individually managed forex trading account.  At least one client located an ACM website through Internet searches and had no prior interaction with Amada.

63.     During the Relevant Period, ACM and Amada acted as a CTA, and its AP, respectively, by exercising discretionary trading authority or obtaining written authorization to exercise discretionary trading authority over an account in connect with retail forex transactions. In addition, ACM and Amada acted as a CTA and its AP, respectively, by providing retail forex trading advice for compensation or profit, and used emails, text messages, the Internet, or other means or instrumentality of interstate commerce to solicit clients for management of retail forex accounts.

64.     During the Relevant Period, ACM was not registered with the Commission as a CTA and it was not exempt or excluded from registration as a CTA.

65.     During the Relevant Period, Amada acted as an AP of ACM by soliciting clients'
or prospective clients' discretionary trading accounts.

66.     During the Relevant Period, Amada was not registered with the Commission as an
AP of a CTA and he was not exempt or excluded from registration.

**5.     ACM Accepted Funds Directly from Clients.**

67.     ACM solicited, accepted, and received funds from clients in the name of ACM for
the purpose of trading individually managed forex accounts.

68.     ACM was not registered with the Commission in any capacity, let alone in the
categories of registrants permitted to accept funds, securities, or other property to purchase,
margin, guarantee, or secure any commodity interest (including forex) of the clients.

B.     **Conclusions of Law**

**1.     Jurisdiction and Venue**

69.     The Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331
(2018) (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (providing that U.S.
district courts have original jurisdiction over civil actions commenced by the United States or by
any agency expressly authorized to sue by Act of Congress).  Section 6c(a) of the Act, 7 U.S.C.
§ 13a-1 (2018), provides that the Commission may bring actions for injunctive relief or to
enforce compliance with the Act or any rule, regulation, or order thereunder in the proper district
court of the United States whenever it shall appear to the Commission that any person has
engaged, is engaging, or is about to engage in any act or practice constituting a violation of any
provision of the Act or any rule, regulation, or order thereunder.

70.     Venue lies properly in this District pursuant to 7 U.S.C. § 13a-1(e) (2018), because Defendants reside in, transacted business in, or committed acts and practices in violation of the Act and Regulations within this District.

**2.     Managed Account Fraud, Solicitation Fraud, and Unauthorized Trading in Forex**

71.     By the conduct described in paragraphs 18 through 68 above, Defendants violated Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A), (C) (2018), and Regulation 5.2(b)(1) and (3), 17 C.F.R. § 5.2(b)(1), (3) (2018), by cheating and defrauding, or attempting to cheat or defraud, and willfully deceiving, or attempting to deceive, their retail forex clients by, among other things, knowingly or recklessly misrepresenting that client funds would be used to trade individually managed forex accounts opened in the clients' names; misrepresenting their profitable trading experience on behalf of clients; providing false account statements to clients; and misappropriating client funds.

72.     When Amada committed the acts, omissions, and failures in violation of 7 U.S.C. § 6b(a)(2)(A) and (C) and 17 C.F.R. § 5.2(b)(1) and (3), he was acting within the scope of his agency, employment, and office at ACM; therefore, such acts, practices, omissions, or failures are deemed to be those of ACM pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2018), and Regulation 1.2, 17 C.F.R. § 1.2 (2018).

73.     Amada controlled ACM, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, ACM's conduct alleged in this Count; therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2018), Amada is liable for ACM's violations of 7 U.S.C. § 6b(a)(2)(A) and (C) and 17 C.F.R. § 5.2(b)(1) and (3).

**3.      Fraud by a Commodity Trading Advisor and its Associate Person**

74.      By the conduct described in paragraphs 18 through 68 above, Defendants violated Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1) (2018), because ACM, acting as a CTA, and Amada, acting an AP of ACM, used the mails or any means or instrumentality of interstate commerce to employ devices, schemes, or artifices to defraud retail forex clients or prospective clients and engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon their retail forex clients or prospective clients.

75.      When Amada committed the acts, omissions, and failures in violation of 7 U.S.C. § 6*o*(1), he was acting within the scope of his agency, employment, and office at ACM; therefore, such acts, practices, omissions, or failures are deemed to be those of ACM pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

76.      Amada controlled ACM, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, ACM's conduct alleged in this Count; therefore, pursuant to 7 U.S.C. § 13c(b), Amada is liable for ACM's violations of 7 U.S.C. § 6*o*(1).

**4.      Failure to Register as a Forex Commodity Trading Advisor and Failure to Register as an AP of a Forex Commodity Trading Advisor**

77.      By the conduct described in paragraphs 18 through 68 above, ACM violated Sections 2(c)(2)(C)(iii)(I)(bb) and 4m(1) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(bb), 6m(1) (2018), and Regulation 5.3(a)(3)(i), 17 C.F.R. § 5.3(a)(3)(i) (2019), by using the mails or other means of interstate commerce to hold itself out generally to the public as a CTA; exercising discretionary trading authority over retail forex transactions in accounts for or on behalf of persons who were neither ECEs nor ECPs; and by failing to register with the Commission as a CTA.

78.     By the same conduct described in paragraphs 18 through 68, Amada violated

7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(bb) and 6k(3) and 17 C.F.R. §5.3(a)(3)(ii), because he was a

partner, officer, employee, consultant, or agent of ACM and he was involved in the solicitation

of ACM's clients' or prospective clients' discretionary accounts without being registered with

Commission as an AP of ACM.

79.     When Amada failed to register with the Commission as an AP, he was acting

within the scope of his agency, employment, and office at ACM; therefore, such acts, practices,

omissions, or failures are deemed to be those of ACM pursuant to 7 U.S.C. § 2(a)(1)(B) and

17 C.F.R. § 1.2.

80.     Amada controlled ACM, directly or indirectly, and did not act in good faith or

knowingly induced, directly or indirectly, ACM's failure to register as a CTA alleged in this

Count; therefore, pursuant to 7 U.S.C. § 13c(b), Amada is liable for ACM's violations of

7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(bb), 6k(3) and 6m(1) and 17 C.F.R. § 5.3(a)(3)(i) and (ii).

**5.     Soliciting, Accepting, or Receiving Funds in the Names of the Commodity Trading Advisor**

81.     By the conduct described in paragraphs 18 through 68 above, ACM violated

Regulations 4.30(a) and 5.4, 17 C.F.R. §§ 4.30(a), 5.4 (2019), by acting as a CTA and soliciting,

accepting, and receiving funds, securities, or other property in its own name to purchase, margin,

guarantee, or secure retail forex for clients without registering as a forex CTA.

82.     Because Amada directly or indirectly controlled ACM and did not act in good

faith or knowingly induced, directly or indirectly, ACM's violations of 17 C.F.R. §§ 4.30(a) and

5.4, Amada is liable for ACM's violations of same pursuant to 7 U.S.C. § 13c(b).

## IV.    PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

83.    Based upon and in connection with the forgoing conduct, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), Defendants are permanently restrained, enjoined, and prohibited from directly or indirectly:

a.    Willfully cheating or defrauding, or attempting to cheat or defraud, or willfully deceiving or attempting to deceive other persons in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with , any other person, other than on or subject to the rules of a designated contract market in violation of Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A), (C) (2018);

b.    Willfully cheating or defrauding, or attempting to cheat or defraud, or willfully deceiving or attempting to deceive any person in connection with any retail forex transaction in violation of Regulation 5.2(b)(1) and (3), 17 C.F.R. § 5.2(b)(1), (3) (2019).

c.    While acting as a CPO or AP, employing any device, scheme, or artifice to defraud any client or participant or prospective client or participant, or engaging in any transaction, practice or course of business which operates as a fraud or deceit upon any client or participant or prospective participant in violation of Section 4$o$(1) of the Act, 7 U.S.C. § 6$o$(1) (2018); or

84.    Defendants are also permanently restrained, enjoined, and prohibited from directly or indirectly:

a.      Trading on or subject to the rules of any registered entity (as that term is

defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2018));

b.      Entering into any transactions involving "commodity interests" (as that

term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2019)), for their own personal account

or for any account in which they have a direct or indirect interest;

c.      Having any commodity interests traded on their behalf;

d.      Controlling or directing the trading for or on behalf of any other person or

entity, whether by power of attorney or otherwise, in any account involving commodity

interests;

e.      Soliciting, receiving, or accepting any funds from any person for the

purpose of purchasing or selling any commodity interests;

f.      Applying for registration or claiming exemption from registration with the

Commission in any capacity, and engaging in any activity requiring such registration or

exemption from registration with the Commission, except as provided for in Regulation

4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2019); or

g.      Acting as a principal (as that term is defined in Regulation 3.1(a),

17 C.F.R. § 3.1(a) (2019)), agent, or any other officer or employee of any person (as that

term is defined in Section 1a(38)), registered, exempted from registration, or required to

be registered with the Commission except as provided for in Regulation 4.14(a)(9).

## V.      RESTITUTION

85.     Defendants shall pay, jointly and severally, restitution in the amount of five

hundred ninety-six thousand, seven hundred dollars and twenty cents ($596,700.20) ("Restitution

Obligation").  If the Restitution Obligation is not paid immediately, post judgment interest shall

accrue on the Restitution Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961 (2018).

86.     Defendant Amada is currently the defendant in the Criminal Action charging him, in part, for the misconduct that is at issue in this matter.  For amounts disbursed to Defendants' clients as a result of satisfaction of any restitution ordered in the Criminal Action, Defendants shall receive a dollar-for-dollar credit against the Restitution Obligation.  Within ten days of disbursement in the Criminal Action to Defendants' customers, Defendants' shall, under a cover letter that identifies the name and docket number of this proceeding, transmit to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581, and the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606, copies of the form of payment to those customers.

87.     To effect payment of the Restitution Obligation and the distribution of any restitution payments to Defendants' clients, the Court appoints the National Futures Association ("NFA") as Monitor ("Monitor").  The Monitor shall receive restitution payments from Defendant Scott and make distributions as set forth below.  Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

88.     Defendants shall make Restitution Obligation payments, and any post-judgment interest payments, under this Consent Order to the Monitor in the name "Amada Restitution Fund" and shall send such payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, to the Office of Administration,

National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606
under cover letter that identifies the paying Defendant and the name and docket number of this
proceeding.  Defendants shall simultaneously transmit copies of the cover letter and the form of
payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three
Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581

89.     The Monitor shall oversee the Restitution Obligation and shall have the discretion
to determine the manner of distribution of such funds in an equitable fashion to Defendants'
clients identified by the Commission or may defer distribution until such time as the Monitor
deems appropriate.

90.     Defendants shall cooperate with the Monitor as appropriate to provide such
information as the Monitor deems necessary and appropriate to identify Defendants' clients to
whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of
any Restitution Obligation payments.  Defendant Amada shall execute any documents necessary
to release funds that he has in any repository, bank, investment, or other financial institution,
wherever located, in order to make partial or total payment toward the Restitution Obligation.

91.     The amounts payable to client shall not limit the ability of any client from proving
that a greater amount is owed from Defendants or any other person or entity, and nothing herein
shall be construed in any way to limit or abridge the rights of any client that exist under state or
common law.

92.     Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each client of
Defendants who suffered a loss is explicitly made an intended third-party beneficiary of this
Consent Order and may seek to enforce obedience of this Consent Order to obtain satisfaction of
any portion of the restitution that has not been paid by Defendants to ensure continued

compliance with any provision of this Consent Order and to hold Defendants in contempt for any violations of any provision of this Consent Order.

93.     To the extent that any funds accrue to the U.S. Treasury for satisfaction of Defendants' Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

94.     Partial Satisfaction:  Acceptance by the Commission or the Monitor of any partial payment of Defendants Restitution Obligation shall not be deemed a waiver of his obligation to make further payments pursuant to this Consent Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

## VI.    MISCELLANEOUS PROVISIONS

95.     Notice:  All notices required to be given by any provision in this Consent Order shall be sent certified mail, return receipt requested, as follows:

Notice to Commission:

> Charles Marvine
> Deputy Director, Division of Enforcement
> Commodity Futures Trading Commission
> 4900 Main Street, Suite 500
> Kansas City, MO  64112

Notice to Defendants:

> Jason Amada and Amada Capital Management LLC
> c/o Alexander Dudelson, Esq.
> 26 Court Street - Suite 2306
> Brooklyn, New York  11242

All such notices to the Commission shall reference the name and docket number of this action.

96.     Change of Address/Phone:  Until such time as Defendants satisfy in full their Restitution Obligation as set forth in this Consent Order, Defendants shall provide written notice

23

to the Commission by certified mail of any change to their telephone numbers or mailing addresses within ten calendar days of the change.

97.     Entire Agreement and Amendments:  This Consent Order incorporates all of the terms and conditions of the settlement among the parties hereto to date.  Nothing shall serve to amend or modify this Consent Order in any respect whatsoever, unless:  (a) reduced to writing; (b) signed by all parties hereto; and (c) approved by order of this Court.

98.     Invalidation:  If any provision of this Consent Order or if the application of any provision or circumstance is held invalid, then the remainder of this Consent Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

99.     Waiver:  The failure of any party to this Consent Order or of any customer at any time to require performance of any provision of this Consent Order shall in no manner affect the right of the party or customer at a later time to enforce the same or any other provision of this Consent Order.  No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

100.     Continuing Jurisdiction of this Court:  This Court shall retain jurisdiction of this action to ensure compliance with this Consent Order and for all other purposes related to this action, including any motion by Defendants to modify or for relief from the terms of this Consent Order.

101.     Injunctive and Equitable Relief Provision:  The injunctive and equitable relief provisions of this Consent Order shall be binding upon Defendants, upon any person under their authority or control, and upon any person who receives actual notice of this Consent Order, by

personal service, e-mail, facsimile, or otherwise, insofar as he or she is acting in active concert or participation with Defendants.

102.    Authority:  Amada warrants that he is the sole owner and managing member of ACM, and that this Consent Order has been duly authorized by ACM and he has been duly empowered to sign and submit this Consent Order on behalf of ACM.

103.    Counterparts and Facsimile Execution:  This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by facsimile, e-mail, or otherwise) to the other party, it being understood that all parties need not sign the same counterpart.  Any counterpart or other signature to this Consent Order that is delivered by other means shall be deemed for all purposes as constituting good and valid execution and delivery by such party of this Consent Order.

104.    Contempt:  Defendants understand that the terms of the Consent Order are enforceable through contempt proceedings, and that in any such proceedings they may not challenge the validity of this Consent Order.

105.    Agreements and Undertakings:  Defendants shall comply with all of the

undertakings and agreements set forth in this Consent Order.

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this

*Consent Order for Permanent Injunction and Other Equitable Relief Against Jason Amada and*

*Amada Capital Management LLC* forthwith and without further notice.

The Clerk of Court is further directed to terminate all pending motions, adjourn all remaining
deadlines, and to close this case.

**SO ORDERED**.

**Dated April 12, 2020**

_____
GREGORY H. WOODS
United States District Judge

**CONSENTED TO AND APPROVED BY:**

Jason Amada, Individually

Dated: 1/15/20

Jason Amada, on behalf of Amada Capital
Management LLC

Dated: 1/15/20

Agreed as to form:

Alexander M. Dudelson
26 Court Street, Suite 2306
Brooklyn, New York 11242
Telephone:  (718) 855-5100
E-mail:  adesq@aol.com

Attorney for Defendants

Dated: 1/24/2020

/s/ Rachel A. Hayes

Nicholas S. Sloey (VA Bar #75438)
Rachel A. Hayes (MO Bar #48713)
Commodity Futures Trading Commission
4900 Main Street, Ste. 500
Kansas City, MO 64112
Telephone: (816) 960-7700
Facsimile:  (816) 960-7751
E-mail:  nsloey@cftc.gov
         rhayes@cftc.gov

Attorneys for Plaintiff

Dated:  April 10, 2020